The plaintiff, Lucille Whaley Miller, administratrix of the estate of Winona Rose Miller Williams, deceased, appeals from a summary judgment in favor of defendants Norwood Clinic, Inc., PC ("Norwood Clinic"), Dr. Silvio Papapietro, Dr. Constantine Athanasuleas, and Dr. David Geer in this medical malpractice/wrongful death action. We affirm in part, reverse in part, and remand.
On January 28, 1986, Ms. Williams, complaining of chest pains, was admitted to Carraway Methodist Medical Center ("Carraway") and was diagnosed as suffering from aortic and mitral valve stenosis. She was scheduled for elective surgery to be performed on February 19, 1986, and was released on February 3, 1986. On February 17, 1986, Ms. Williams was readmitted to Carraway, and on February 19, surgery was performed to replace the aortic and mitral valves. Ms. Williams was discharged on February 26, 1986. That evening she went to Woodland Community Hospital, complaining again of chest pains. She was transferred to Carraway, where she was examined and treated and was released several hours later. Three days later, on March 1, 1986, at 10:04 p.m., Ms. Williams, complaining of nausea and vomiting, was examined at the Cullman Medical Center emergency room. She was diagnosed as suffering from possible pericardial tamponade and was treated and transferred to Carraway via helicopter. She arrived at Carraway at 12:07 on the morning of March 2, 1986, and was evaluated and prepared for surgery. While awaiting surgery in the Cardiac Surgery Intensive Care Unit, however, Ms. Williams suffered a heart attack, at approximately 3:00 to 3:15 a.m. Emergency surgery was performed in the intensive care unit, and, when her vital signs indicated that she was sufficiently stabilized, she was taken to the operating room for closure at approximately 3:50 a.m. Ms. Williams continued under the care of heart specialists until her death at 11:25 a.m. on March 6, 1986.
On April 29, 1987, the plaintiff filed a multi-count complaint in the Circuit Court of Jefferson County, alleging negligence and breach of contract leading to the March 6, 1986, death of Ms. Williams. The complaint stated a cause of action against three named defendants and various fictitiously named defendants "AA" and "A" through "R." On January 14, 1988, the *Page 862 
plaintiff amended the complaint to substitute named parties for "AA" and "A." On September 13, 1989, the plaintiff again sought to amend the complaint, to substitute Norwood Clinic for fictitiously named defendant "C" and to substitute three employees of Norwood Clinic — Dr. Papapietro, Dr. Athanasuleas, and Dr. Geer — for fictitiously named defendants "D." The original complaint characterized fictitiously named defendants "C" and "D" as follows:
 " 'C,' whether singular or plural, that medical partnership, professional association or professional corporation which undertook to provide medical services to Plaintiff's decedent on the occasion made the basis of this suit; 'D,' whether singular or plural, being that physician, including interns, residents or fellows, who undertook to provide medical services to the Plaintiff's decedent on the occasions made the basis of this suit. . . ."
(Emphasis added.) The trial court entered a summary judgment in favor of Norwood Clinic, Dr. Papapietro, Dr. Athanasuleas, and Dr. Geer, stating as follows:
 "The Court is of the opinion that the Plaintiff was aware of, or should have been aware of, the identity and the cause of action against these four Defendants on or prior to January 14, 1988, based on the answers to the interrogatories and the records that were reviewed.
 "Therefore, the Court is of the opinion that the action filed in the amendment of [September 13, 1989],[1] was more than two years from the date of death, which was March 6, 1986, and that the Plaintiff knew of the identity of the four Defendants in the amendment and the cause of action against them on or before January 14, 1988, yet the Plaintiff waited until [September 13, 1989], to file an amended complaint naming these Defendants. . . . [T]he cause of action against said Defendants is barred by the Statute of Limitations."
It is without dispute that the September 13, 1989, amendment to the complaint was made after the two-year statutory period of limitations had expired, see Ala. Code 1975, § 6-5-482; therefore, in order for the plaintiff's action against these defendants not to be time barred, the substitutions must relate back under Rule 9(h), A.R.Civ.P., pursuant to Rule 15(c), A.R.Civ.P.
The plaintiff argues that she stated a cause of action against the fictitiously named defendants within the body of the complaint and that she was ignorant of the identity of those fictitiously named defendants, in the sense of not having, at the time of the filing of the complaint or within two years of the alleged negligent treatment, knowledge sufficient to identify Norwood Clinic, Dr. Papapietro, Dr. Athanasuleas, and Dr. Geer as parties also intended to be sued. The defendants contend that the plaintiff had knowledge of their names and the role that each played in the treatment of Ms. Williams, by virtue of the medical records that were made available to her on June 9, 1986. We agree as to Dr. Papapietro, Dr. Athanasuleas, and Dr. Geer.
 "The correct test is whether the plaintiff knew, or should have known, or was on notice, that the substituted defendants were in fact the parties described fictitiously. See, also, Columbia Engineering Int'l, Ltd. v. Espey, 429 So.2d 955
(Ala. 1983); Threadgill v. Birmingham Board of Education, 407 So.2d 129 (Ala. 1981); Minton v. Whisenant, 402 So.2d 971 (Ala. 1981); Eason v. Middleton, 398 So.2d 245 (Ala. 1981)."
Davis v. Mims, 510 So.2d 227, 229 (Ala. 1987).
The medical records reveal that Dr. Papapietro first treated Ms. Williams from January 28, 1986, through February 2, 1986. Dr. Papapietro was designated as her "doctor in charge," and he diagnosed her as suffering from aortic and mitral valve stenosis. Virtually every page of the *Page 863 
66-page medical record prepared during that period is marked with Dr. Papapietro's name and his notations of diagnoses and treatments prescribed for Ms. Williams. Ms. Williams's medical records for February 17, 1986, also reflect Dr. Papapietro's treatment and diagnosis of her condition. Ms. Williams's records for February 26, 1986, reflect that Dr. Papapietro also saw her that day, prescribed medication for her, and "discussed follow-up." In Ms. Williams's records for March 1, 1986, Dr. Patrick W. Davis noted that "the patient was transferred via helicopter to Carraway to the service of Dr. Papapietro and Dr. Geer."[2] On March 1, 1986, Ms. Williams's husband also signed a consent-to-transfer form, permitting the transfer of his wife to Dr. Papapietro's care.
As to Dr. Athanasuleas, virtually every page of Ms. Williams's 84-page medical record that was prepared from February 17, 1986, through February 26, 1986, is marked with his name, notations, observations, and prescribed treatment. He is on record as the "doctor in charge" of Ms. Williams during that period and was authorized by Ms. Williams to perform "Aortic Valve Replacement and Mitral Valve Replacement" in order to "correct the condition[s] which appear indicated by the diagnostic studies already performed." Dr. Athanasuleas's involvement with Ms. Williams was noted as early as February 3, 1986, in a letter from Dr. Papapietro to Dr. Hollis Keel, her referring physician:
 "Ms. Williams was also evaluated by Dr. Constantine Athanasuleas, cardiac surgeon, who felt aortic and mitral valve surgery [was] clearly indicated. She will probably require aortic valve replacement and either mitral commissurotomy or mitral valve replacement. The patient was discharged today to be readmitted to Dr. Athanasuleas' service on 2-17-86; for valvular surgery. She was discharged in good condition and on no medications."
Dr. Athanasuleas was listed as the lead surgeon on Ms. Williams's surgery team, and he performed the heart valve replacement surgery on February 19, 1986. Upon her readmittance to Carraway on March 2, 1986, Dr. Athanasuleas was listed once again as the "doctor in charge" and, again, virtually every page of the 110-page medical record that was prepared from that date until Ms. Williams's death on March 6, 1986, is marked with Dr. Athanasuleas's name, notations, diagnoses, prescribed treatment, requested consultations, and the like.
With respect to Dr. Geer, the medical records clearly reflect that Dr. Geer saw Ms. Williams shortly after his notification by telephone of her arrival at Carraway in the early morning of March 2, 1986. Ms. Williams's husband again signed a consent-to-surgery form, this time allowing Dr. Geer's "Exploration for Pericardial Tamponade." Dr. Geer's treatment procedures are likewise recorded throughout many of the pages of the record up until Ms. Williams's death. Dr. Geer is noted by Dr. Davis as apparently having performed valvular heart surgery on Ms. Williams some 10 days before March 1, 1986. Dr. Geer's signature also appears on several physician order sheets and progress notes that were prepared both before and after Ms. Williams's February 19, 1986, surgery. He and Dr. Athanasuleas were the two doctors designated by the cardiac surgical unit's preoperative orders of February 17, 1986, as having operative permits for Ms. Williams. *Page 864 
The plaintiff cites Dannelley v. Guarino, 472 So.2d 983
(Ala. 1985), and Browning v. City of Gadsden, 359 So.2d 361
(Ala. 1978), as containing facts analogous to the facts in this case. In those cases, prior to the substitution of parties there was no suggestion of the possible involvement of the parties that the plaintiff later attempted to substitute. That is not the case here. The medical records before us are replete with indications that each of the three doctors in this appeal treated Ms. Williams's varying heart conditions off and on from January 1986 until her death on March 6, 1986. Even the plaintiff admits in her brief that "[a]fter the doctors drained the cardiac tamponade and closed her chest, Mrs. Williams was placed on a life support system where she continued in the careof Drs. Geer, Athanasuleas, Papapietro, and others." (Emphasis added.) Thus, we must conclude that when she filed her complaint the plaintiff either knew, or should have known, that Dr. Papapietro, Dr. Athanasuleas, and Dr. Geer were, in fact, the parties described fictitiously in the complaint. See, e.g.,Ex parte Klemawesch, 549 So.2d 62 (Ala. 1989); Bowen v.Cummings, 517 So.2d 617 (Ala. 1987); and Harvell v. IrelandElectric Co., 444 So.2d 852 (Ala. 1984).
We note the plaintiff's argument that "the records . . . do not indicate in any way what services, if any, the defendant physicians performed upon Mrs. Williams during the period of time of the alleged negligence which occurred prior to Mrs. Williams' heart attack . . . on March 2, 1986." However, although originally complaining of the conduct of certain unknown doctors "on the occasions made the basis of this suit," it appears that the plaintiff attempts to now redefine those "occasions" to be the very narrow period between Ms. Williams's arrival at Carraway at 12:07 a.m. on March 2, 1986, and her heart attack around 3:00 to 3:15 a.m. The complaint, however, does not limit the alleged negligence to that period.
We also note the plaintiff's argument that because her medical expert, after reviewing Ms. Williams's medical records, did not specifically recommend that these defendants be designated by name in the original complaint, she should be relieved of the responsibility for not doing so. However, in a March 2, 1987, letter, the plaintiff's expert stated, in pertinent part, as follows:
 "As a result of the substandard care provided to Mrs. Williams . . . [she] died prematurely at the age of 38. My reasons for concluding this will be enumerated in the subsequent paragraphs.
". . . .
 "On [1/28/86], Mrs. Williams was admitted to Carraway Hospital for cardiac catheterization, which was performed by Dr. Papapietro on 1/30/86. This revealed mild pulmonary arterial hypertension, severe aortic stenosis, mild to moderate mitral stenosis, mild aortic insufficiency, and normal coronary arteries. Valvular surgery was recommended to Mrs. Williams. She was discharged from the hospital on 2/3/86 on no medications.
 "She was re-admitted to Carraway Hospital, to the service of Dr. Athanasuleas, a cardiac surgeon, on 2/17/86. She underwent double valve replacement of both the mitral and aortic valves on [2/19/86]. Her postoperative course was unremarkable, and she was discharged on 2/26/86 on Lanoxin and Coumadin.
". . . .
 "My criticism of [the] medical care is [the failure] to consider the possibility of postpericardiotomy syndrome in this patient, who was not eight days postvalvular surgery. This is a syndrome which occurs in patients who have had the pericardium opened and manipulated, as this patient did for her valvular surgery. . . . [P]atients typically complain of . . . chest pain.
 "If the physician does not recognize the implication of the chest pain, and inappropriately ascribes it to the surgical incision, the results can be disastrous, because a complication of the postpericardiotomy syndrome is cardiac tamponade."
This letter indicates that the plaintiff's expert mentioned both Dr. Papapietro and Dr. Athanasuleas by name because, as the *Page 865 
medical records show, they had been actively involved in the care and treatment of Ms. Williams prior to her death. The expert's failure to specifically recommend that these defendants be designated by name in the original complaint does not change the fact that the plaintiff either knew or should have known, based upon all of the information that she had before her, that these defendants were parties intended to be sued.
The medical records, however, are silent as to Norwood Clinic's role in providing treatment for Ms. Williams. Neither does our thorough review of the rest of the record on appeal provide any indication that "the plaintiff knew, or should have known, or was on notice" that Norwood Clinic was the "medical partnership, professional association, or professional corporation" originally intended to be sued. Accordingly, we hold that the amendment of September 13, 1989, substituting Norwood Clinic for fictitiously named defendant "C" relates back to the date of the original filing so as to make Norwood Clinic a proper party defendant. See, Mi-Lady Cleaners v.McDaniel, 235 Ala. 469, 179 So. 908 (1938); 57 C.J.S.2d Masterand Servant § 570(c) (1948).
For the foregoing reasons, the judgment of the trial court is affirmed as to Dr. Papapietro, Dr. Athanasuleas, and Dr. Geer; the judgment is reversed as to Norwood Clinic, and the cause is remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES and KENNEDY, JJ., concur.
[1] Although the trial court recognized August 31, 1989, as the date the amendment in question was filed, the record indicates that that was the date of the certificate of service and that the amended complaint was actually stamped "filed" in the Jefferson County Circuit Court clerk's office on September 13, 1989. Therefore, for purposes of this appeal and throughout this opinion, we will refer to September 13, 1989, as the date the amendment was filed.
[2] A November 24, 1987, affidavit of Ms. Williams's attending physician in Cullman, Dr. Davis, supporting his own motion for summary judgment in this case, reconfirms Dr. Papapietro's involvement on March 1, 1986:
 "I first saw Mrs. Williams on March 1, 1986, on consultation requested by the emergency room physician at Cullman Medical Center. . . . [I]t was my clinical judgment to transfer Mrs. Williams to Carraway Methodist Medical Center where her attending cardiologist and cardiac surgeons could more appropriately diagnose and treat her condition. . . . Before transferring Mrs. Williams, I called and discussed the suspected diagnosis and transfer with Mrs. Williams' cardiologist, Dr. S. Papapietro. He concurred with my plan."
We note that summary judgment was entered for Dr. Davis, and there has been no appeal from that judgment.