PER CURIAM.
Dr. L. Lamar Snow, Dr. Steven L. Weinstein, and Surgical Association of Mobile, P.A., defendants in a medical-malpractice action pending in the Mobile Circuit Court, petition for a writ of mandamus directing Judge Joseph S. Johnston, to grant their motion for a summary judg.ment. They contend they are entitled to a summary judgment on the basis that the applicable statute of limitations, Ala.Code § 6-5-482, bars the plaintiffs’ claims against them. This petition requires an interpretation of Rule 9(h), Ala.R.Civ.P., relating to fictitious parties, and Rule 15(c), pertaining to the relation back of amendments to pleadings.
On August 11, 1993, Mary Alayne Kendall went to the emergency room at South Baldwin Hospital in Foley, suffering abdominal pain. An ultrasound procedure revealed that Mrs. Kendall was suffering from gallstones and that she had a gallstone in the common bile duct. Dr. Tyler Nichols referred Mrs. Kendall to Spring-hill Memorial Hospital (“Springhill”) in Mobile, for treatment. Mrs. Kendall was initially treated in SpringhilTs emergency room and then was admitted to the hospital. Dr. Charles Ivey Williamson took a patient history and performed a physical examination on Mrs. Kendall. His notes stated, in pertinent part:
“HISTORY: Mrs. Kendall is a young, white female referred by Dr. Tyler Nichols of Foley, AL, who presented to the Emergency Room there, having had severe pain in the right upper quadrant for several days. On the phone, Dr. Nichols reported a stone in the common duct. There were numerous stones in the gallbladder, amylase elevation and slight bilirubin elevation, according to my recollection. She was referred here for further evaluation of acute cholecys-titis, early pancreatitis and a stone in the common bile duct.
“IMPRESSION: 1. ACUTE CHOLE-CYSTITIS, STONE IN THE COMMON BILE DUCT ON SONOGRAM AT BALDWIN HOSPITAL.
“RECOMMENDATIONS: Ask Dr. Frank Vizzi to evaluate. Plan laparo-scopic stone removal followed by laparo-scopic cholecystectomy. This has been discussed with the patient and will be discussed with the patient and family by Dr. Vizzi and [Drs.] Snow, Weinstein and Hannon.”
On August 12, 1993, Dr. Frank Vizzi and Dr. Ivey Williamson, of the Internal Medicine Center, performed a procedure known as an endoscopic retrograde cholangiopan-creatography (“ERCP”) study; a papilloto-my; and an endoscopic sphincterotomy on Mrs. Kendall. Dr. Vizzi’s “procedure note” described the ERCP procedure and his findings as follows:
“PROCEDURE: ERCP WITH PAPIL-LOTOMY.
“FINDINGS: After explaining the procedure and its risks including perforation and pancreatitis to the patient, I sprayed the back of the throat with Ce-tacaine spray and sedated patient as above. I then inserted the Siberian scope into the mouth and down into the second portion of the duodenum. I visualized the papillae. The papillae appeared normal though. The pancreatic duct was then cannulated which filled normally to its tail. Next, the common bile duct was cannulated and the common bile duct, the left and right hepatic ducts filled normally. There was no filling initially of the cyst duct. A 12 mm. spincterotomy was then done. There was a minimal amount of bleeding which was stopped by heating coag., then an *533 11.5 balloon was passed up the common bile duct and swept the common bile duct. No stone or stone material appeared to come out of the common bile duct.
“RECOMMENDATION: Continue antibiotics until the morning and lap. cho-lecystectomy in a.m. if possible.”
Later that same day, Dr. L. Lamar Snow and Dr. Steven L. Weinstein performed a laparoscopic cholecystectomy (surgical removal of the gallbladder) on Mrs. Kendall. Dr. Snow’s “operative summary” stated:
“OPERATIVE PROCEDURE: Under general endotracheal anesthesia, abdomen was prepped and draped in the usual manner. The peritoneal cavity was insufflated through the umbilicus. Three working ports were then placed in the right upper quadrant and upper midline and the gallbladder was grasped, the neck was exposed and cleaned off. A tyanscystic duct cholan-giogram showed complete blockage of the distal common duct and what appeared to be large defects within the common duct thought to be probable blood clots. The duct was compressed and large clots were extruded through the cystic duct. A 5-wire helicobasket was then inserted through the cystic duet into the common duct and into the duodenum and multiple large clots were retrieved. Repeat cholangiogram appeared to be normal. It was elected to leave the drainage tube. A 12 Redd-Robinson catheter was placed in the common duct via the cystic duct and held in place with a plain Ender loop. The cystic artery was then double clipped and divided and the gallbladder removed from the gallbladder bed and brought out through the upper midline incision. The T-Tube was then brought out through the upper midline port and a 15 Silastic drainage tube was placed in the subhepatic space and brought out through the right flag port. The other incisions were closed with staples. The wounds were dressed. The patient was sent to Recovery in stable condition.”
On the second day after surgery, Mrs. Kendall developed “multi-system organ failure with pancreatitis, hepatic insufficiency, pulmonary insufficiency, and renal failure.” On August 19, 1993, Mrs. Kendall underwent an exploratory laparosco-py. Dr. Snow’s operative report stated:
“PREOP DIAGNOSIS: Severe sepsis with respiratory distress syndrome and DIC with complete renal failure secondary to pancreatitis, secondary to stone, status post laparoscopic cholecystectomy and exploration of the common duct, insertion of drainage tube.
“POSTOP DIAGNOSIS: Same with possible obstructed distal common duct with possible yeast cholangitis and large pancreatic phlegmon secondary to pan-creatitis.”
Over the next several days, Mrs. Kendall developed “ischemic changes to the extremities.” Her family requested further evaluation, and she was transferred by air ambulance to the University of Alabama at Birmingham Hospital (UAB Hospital), in Birmingham. Ultimately, Mrs. Kendall’s condition required amputation of both legs below the knees and the loss of her thumbs and all the fingers on both hands.
■ Later in 1993, Mrs. Kendall and her husband sought legal advice concerning a possible malpractice action. In the course of his investigation, the Kendalls’ attorney requested Mrs. Kendall’s medical records from Springhill and various physicians who had treated her. Dr. Snow received a letter from the Kendalls’ attorney dated December 7, 1993, requesting Dr. Snow’s office records. On December 21, 1993, Dr. Snow forwarded his medical records to the plaintiff, along with a letter. Dr. Snow’s letter stated:
“Enclosed please find a copy of the records you requested. In addition I have included a short summary of the
*534 salient events occurring during the hospitalization of Ms. Mary Kendall.
“She was admitted to Springhill Memorial Hospital by a gastroenterologist with the diagnosis of acute cholecystitis, choledocholithiasis and possible pan-creatitis. I was consulted regarding a laparoscopic cholecystectomy to follow ah endoscopic retrograde choledocho-pancreatogram with ampullary papillo-tomy to remove the common duct stone. The ‘ERCP’ with papillotomy was performed the next morning. Following this she developed severe abdominal pain and tenderness on abdominal examination and an elevated amylase. She was taken to surgery that evening for a cholecystectomy. A routine operative cholangiogram was obtained which showed obstruction of the common bile duct. The duct was explored and blood clots were removed. A drainage tube was left in the common duct. Postoper-atively she continued to develop fulminate pancreatitis with sepsis which progressed to severe prolonged multiple organ failure including ARDS [adult respiratory distress syndrome, or lung failure], liver failure, kidney failure, and heart failure. We were extremely gratified by her eventual survival against overwhelming odds. The treatment events eventually leading to her recovery are well documented in the hospital record. Suffice to say that she would have died without the exemplary care by each and every physician, nurse and specialty technician involved in her care.
“If I can be of further assistance please do not hesitate to call or write.” The Kendalls’ attorney subsequently forwarded Mrs. Kendall’s medical records (including the records forwarded by Dr. Snow) to a board-certified surgeon for a review of the care that was given to Mrs. Kendall by Springhill and various physicians.
On January 12, 1995, Mrs. Kendall and her husband filed a medical-malpractice action against Springhill Memorial Hospital; Dr. Frank Vizzi; and Dr. Vizzi’s medical group, Internal Medicine Center. Mrs. Kendall alleged negligence in regard to the treatment she had received, and her husband claimed a loss of consortium. Specifically, the complaint stated:
“2. The plaintiff further alleges that all of her injuries and damages as set forth hereinbelow were proximately caused by the negligence of the defendants in one or more of the following respects:
“a. negligently performing the ERCP and spincterotomy;
“b. negligently failing to provide the plaintiff with adequate medical care and treatment;
“c. negligently furnishing the plaintiff with incompetent and unskilled personnel.”
The complaint also named certain fictitious defendants, described as “A, B and C, the person or persons who were responsible for the medical care and treatment of the plaintiff, Mary Alayne Kendall, at the time and place made the basis of this lawsuit; whose names and true legal identities are otherwise unknown at this time, but who will be added by amendment when ascertained; individually and jointly.”
On August 8, 1995, the Kendalls amended their complaint to add Dr. Ivey Williamson as a defendant. The complaint also added a claim alleging that the defendants had acted wantonly. On March 12, 1996, Dr. Vizzi was deposed. In that deposition, Dr. Vizzi testified that the standard of care required that a cho-lecystectomy not be performed if the patient exhibited severe abdominal pain coupled with an increased amylase. On March 15, 1996, the Kendalls amended their complaint to substitute Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile, P.A. for fictitious defendant “A.” Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile then moved to dismiss the plaintiffs’ second amended complaint, *535 on the grounds that it had been filed more than two years after the act giving rise to the claim. See § 6-5-482, Ala. Code 1975.
The trial judge denied the motion to dismiss. That trial judge subsequently re-cused himself, and the case was assigned to Judge Joseph S. Johnston. Thereafter, Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile moved for a summary judgment, again basing their motion on their claim that the statutory limitations period had expired before the second amended complaint was filed. Judge Johnston denied the motion for summary judgment on September 30, 1997. On October 3, 1997, Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile moved the court to “reconsider” its ruling or, alternatively, to give the statement required for an interlocutory appeal. See Rule 5(a), Ala.R.App.P. The court denied that motion on November 12, 1997. On January 12,1998, Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile filed this petition for the writ of mandamus.
The Kendalls added Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile as defendants by .an amendment filed after the two-year statutory limitations period for a medical-malpractice action had expired. See § 6-5-482, Ala.Code 1975. Therefore, the Kendalls’ claims against Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile are time-barred unless the amendment adding them as defendants relates back under Rule. 9(h), Ala.R.Civ.P., pursuant to Rule 15(c).
Rule 9(h) states:
“Fictitious Parties. When a party is ignorant of the name of an opposing party and so alleges in the party’s pleading, the opposing party may be designated by any name, and when that party’s true name is discovered, the process and all pleadings and proceedings in the action may be amended by substituting the true name.”
“Such a substitution is allowed to relate back to the date of the original complaint if the original complaint adequately described the fictitiously named defendant and stated a claim against such a defendant.” Fulmer v. Clark Equipment Co., 654 So.2d 45, 46 (Ala.1995).
It is undisputed that Mrs. Kendall knew the identities of Dr. Snow and his associates before she and her husband filed their lawsuit. Here, however, we are called upon to determine whether a plaintiffs ignorance of a cause of action against a particular defendant is to be treated the same as the plaintiffs ignorance of the identity of that defendant.
Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile argue that the Ken-dalls knew when they filed the lawsuit that Dr. Snow and Dr. Weinstein had performed a laparoscopic cholecystectomy on Mrs. Kendall on August 12, 1993. They argue that because of this fact, the Ken-dalls had, on the date they filed the lawsuit, sufficient knowledge to believe that they had a cause of action against Dr. Snow and his associates. Alternatively, Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile argue that the Kendalls failed to exercise due diligence in identifying them as parties intended to be sued and, therefore, that the Kendalls’ amendment was untimely.
The Kendalls contend that their substitution of these three defendants complied with the requirements of Rule 9(h) and 15(c), and, therefore, that it relates back to the date they filed the complaint. They argue that within the body of the complaint they stated a cause of action against the fictitiously named defendants and that when they filed the complaint they were ignorant of the identity of fictitious defendant “A” in that they did not have sufficient knowledge to identify Dr. Snow and his associates as parties that they should also sue. They contend that it was not until Dr. Vizzi was deposed on March 12, 1996, that they realized that Dr. Snow had acted negligently. In support of their ar *536 gument, they cite Roberts v. Cochran, 656 So.2d 353 (Ala.1995). Thus, they argue, the trial court could have concluded, and correctly so, that the amendment adding the claim against Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile related back to the date the original complaint was filed. We disagree.
This Court’s most recent substantive discussion of the relation-back doctrine came in Marsh v. Wenzel, 732 So.2d 985 (Ala.1998). That case also was a medical-malpractice case. There, Ms. Marsh sought treatment from Dr. Green after she had discovered a lump in her breast. Dr. Green performed a biopsy and sent the specimen to Dr. Wenzel for analysis. Dr. Wenzel examined the specimen and reported that it was benign. Marsh continued to see Dr. Green for treatment of the lump in her breast. Dr. Green subsequently removed the lump; a biopsy of that tissue revealed the presence of infiltrating ductal cell carcinoma. Marsh sued Dr. Green and his professional corporation. Approximately one month after the expiration of the statutory limitations period, Dr. Wen-zel reexamined the tissue removed in the biopsy and, for the first time, reported that the presence of cancerous tissue was detected. Marsh subsequently amended her complaint to add as defendants Dr. Wenzel and his professional corporation.
The trial court entered a summary judgment for Dr. Wenzel and his professional corporation on the basis that Marsh’s claims were barred by the statute of limitations. This Court affirmed, holding that § 6-5-482, a part of the Alabama Medical Liability Act, did not provide an absolute bar to her lawsuit, but that Marsh did not satisfy the requirements of Rule 9(h) so as to entitle her to the benefits of the doctrine of relation back. We concluded that Marsh had not been ignorant of Dr. Wen-zel’s identity, but of her cause of action against him, and that Rule 9(h) excused only ignorance of the identity of a party against whom a cause of action has been stated. 732 So.2d at 988-90.
Our decision in Marsh accorded with well-established precedent. See Harmon v. Blackwood, 623 So.2d 726, 727 (Ala.1993) (when a plaintiff knows the name of the physician and the physician’s involvement in treating the patient, it is incumbent upon a medical-malpractice plaintiff, before the expiration of the statutory limitations period, to investigate and evaluate his claim to determine who is responsible for the injury or harm the plaintiff claims to have suffered and to ascertain whether there is evidence of malpractice); Miller v. Norwood Clinic, Inc., P.C., 577 So.2d 860, 864-65 (Ala.1991) (an amendment to a medical-malpractice complaint to substitute three physicians for fictitiously named parties did not relate back for limitations purposes where the plaintiff should have known, when she filed the complaint, that the physicians were, in fact, the parties described fictitiously).
Moreover, the present case is factually distinguishable from our decision in Roberts v. Cochran, and the cases cited therein. Roberts arose out of an automobile accident. In that case, no extensive records were available to the plaintiff before discovery. In concluding that the amended complaint related back, we specifically noted that when the complaint was filed the plaintiff Roberts had no information that would have indicated to her that she had a cause of action against Cochran. It was not until after a difficult-to-loeate party was served and deposed that Roberts was apprised of facts indicating that she had a cause of action against Cochran.
The Kendalls argue that they, likewise, were unaware that they had a cause of action against Dr. Snow and his associates until Dr. Vizzi was deposed on March 12, 1996, because they say that until that date they were unaware that Mrs. Kendall had been experiencing severe abdominal pain and an elevated amylase after the ERCP. However, the Kendalls are not in the position the plaintiff in Roberts was in. The Kendalls had available to them all of Mrs. Kendall’s medical records, from Springhill *537 and from her various physicians — including all the records maintained by Dr. Snow and Dr. Weinstein and their medical association. Included in this information was the letter Dr. Snow wrote to Mrs. Kendall’s attorney in December 1993 in which he noted that following the ERCP Mrs. Kendall developed severe abdominal pain and an elevated amylase. This information was provided approximately 4 months after Mrs. Kendall’s surgery and some 20 months before the statutory limitations period expired.
Despite the fact that Mrs. Kendall had this information, the initial complaint and the first amended complaint made no mention of the surgical procedure performed by Dr. Snow and Dr. Weinstein. The initial complaint alleged that the named and fictitious parties had performed “a procedure known as an endoscopic retrograde cholangiopancreatography (ERCP) and sphincterotomy” on Mrs. Kendall. Dr. Snow and Dr. Weinstein did not perform either of these procedures. Furthermore, the negligence alleged in the complaint was “negligently performing the ERCP and sphincterotomy” and a general negligent failure to provide adequate medical care. The subsequent first amended complaint likewise made no mention of any negligence with regard to the laparoscopic cholecystectomy performed by Dr. Snow and Dr. Weinstein. Instead, the amended complaint added only Dr. Williamson, and it alleged that Dr. Vizzi and Dr. Williamson had negligently or wantonly performed the “ERCP.” It was not until they filed the second amended complaint on March 15, 1996, that the Kendalls made any mention of the laparoscopic cholecystectomy performed by Dr. Snow and Dr. Weinstein. Given these facts, we cannot say that the initial complaint even stated a cause of action against Dr. Snow and his associates. See § 6-5-551, Ala.Code 1975.
A writ of mandamus is proper in a case such as this if the undisputed evidence shows that the plaintiff failed to act with due diligence in identifying the fictitiously named defendant as the party the plaintiff intended to sue. See Ex parte Stover, 663 So.2d 948, 952 (Ala.1995); Ex parte FMC Corp., 599 So.2d 592, 595 (Ala.1992). The Kendalls knew the names of Dr. Snow and Dr. Weinstein and their professional association. They also knew that Dr. Snow and Dr. Weinstein had performed surgery on Mrs. Kendall. Moreover, Dr. Snow’s letter put the Kendalls on notice, long before the statutory limitations period ran, that following the ERCP Mrs. Kendall was experiencing severe abdominal pain and an elevated amylase. Although the Kendalls may not have known the significance of the information they had, it was incumbent upon them to learn of that significance.
“[W]hen a plaintiff knows the name of a physician and the involvement of that physician in the treatment of the patient, it is incumbent upon the plaintiff, before the running of the statutory period, to investigate and to evaluate his claim to determine who is responsible for the injury and to ascertain whether there is evidence of malpractice.”
Harmon v. Blackwood, 623 So.2d at 727. Here, just as in Harmon, the plaintiffs failed to diligently investigate and evaluate their claim before the limitations period expired. Because the Kendalls failed to meet the criteria for invoking the relation-back principles of Rule 9(h) and Rule 15(c), the second amended complaint did not relate back to the date of the filing of the original complaint. Accordingly, the claim stated against Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile, P.A., was barred by the statute of limitations.
The facts of this case make our decision a difficult one. However, medical-malpractice cases, by their very nature, virtually always involve patients in difficult situations. As we stated in Marsh v. Wenzel:
“We are not oblivious to the reality of these hard facts. But we are constrained by the time limits imposed by the legislature on the commencement of actions. Counsel’s obligation to act in good faith and to act consistently with high ethical standards requires that *538 counsel strike a balance between, on the one hand, the obligation to present, within the period of limitations, the full range of claims essential to protect the interests of a plaintiff, and, on the other hand, the competing obligation to refrain from bringing groundless or frivolous claims. Whether it would be wise to create an exception to the statute of limitations when a defendant has not been joined on account of counsel’s good faith efforts to satisfy these competing obligations is not properly a question for this Court. We recognize that because we are declining to engage in a legislative function, a potentially liable defendant might have a valid statute-of-limitations defense under such circumstances. But this dilemma is as old as statutes of limitations. However, second-guessing the wisdom of any choice between these competing obligations should be undertaken only with a high degree of deference and great caution, lest we promote an unhealthy public policy of pressuring a plaintiff to assert claims that ought not be pursued.”
732 So.2d at 990.
The petition for the writ of mandamus is granted. The trial judge is directed to vacate his order denying a summary judgment, and to enter a summary judgment for Dr. Snow, Dr. Weinstein, and Surgical Association of Mobile, P.A., on the Ken-dalls’ claims.
WRIT GRANTED.
HOOPER, C.J., and MADDOX, HOUSTON, SEE, and BROWN, JJ., concur.
COOK, J., concurs specially.
LYONS and JOHNSTONE, JJ., recuse themselves.